Wilkerson v. City of College Station, Texas
















IN THE
TENTH COURT OF APPEALS
 

No. 10-00-360-CV

     BARRY WILKERSON,
                                                                         Appellant
     v.

     THE CITY OF COLLEGE STATION,
     TEXAS,
                                                                         Appellee
 

From the County Court at Law No. 2
Brazos County, Texas
Trial Court # 49,367-CCL2
                                                                                                                
                                                                                                         
O P I N I O N
                                                                                                                

      Barry Wilkerson brought suit against the City of College Station (the “City”) to recover
compensation earned as an “on call” employee. Wilkerson brought suit under a breach of contract
theory. The County Court at Law granted summary judgment in favor of the City. Wilkerson
raises three points on appeal: 1) the City’s policy manual creates an entitlement to additional
benefits for “on call” employees; 2) he did not waive his breach of contract claim by accepting
the new terms of employment because the City’s “on-call” policy has not been modified; and 3)
the claim is not barred by the statute of limitations.
Background Facts
      Wilkerson worked for the College Station Police Department (the “Department”) from August
1985 until his termination in December 1998. Both parties concede that the employment was at-will.


 He worked as a Crime Scene Technician for the Department from May 1988 until his
termination. Wilkerson contends that he was required as a Crime Scene Technician to respond
to major crime scenes on a 24-hour basis. The Department policy manual provides that “on-call”
employees receive an additional ten dollars ($10) per day emergency stand-by pay. In late 1990
or early 1991, Wilkerson complained to his supervisors concerning the City’s failure to pay him
as an “on-call” employee. The City informed Wilkerson through the Police Chief that he was not
an on-call employee and not required to come to the crime scenes.
      After 1991, it is undisputed that Wilkerson did not claim “on-call” status on his time sheets,
his name did not appear on the Department’s “on-call” roster, and he was not told personally or
in writing that he was an “on-call” employee. Wilkerson states, however, that his name appeared
on the “on-call” roster for the first several months he was a crime scene technician. Further, he
asserts that the Chief told him to respond to the crime scenes on a 24-hour basis, or he would lose
his job. Wilkerson continued to work for the Department until 1998 without receiving “on-call”
pay.
Standard of Review
      To prevail on a traditional summary judgment motion, the movant must demonstrate that there
are no genuine issues of material fact and that it is entitled to judgment as a matter of law. See
American Tobacco Co. v. Grinnell, 951 S.W.2d 420, 425 (Tex. 1997); Nixon v. Mr. Prop.
Management Co., 690 S.W.2d 546, 548 (Tex. 1985); Fletcher v. Edwards, 26 S.W.3d 66, 73
(Tex. App.—Waco 2000, pet. denied). Summary judgment is proper if the defendant disproves
at least one essential element of the plaintiff’s cause of action, or conclusively establishes each
element of an affirmative defense. See American Tobacco Co., 951 S.W.2d at 425. If the
movant’s motion and summary judgment proof facially establish its right to judgment as a matter
of law, the burden shifts to the non-movant to raise a material fact issue sufficient to defeat
summary judgment. See Dolcefino v. Randolph, 19 S.W.3d 906, 916 (Tex. App.—Houston [14th
Dist.] 2000, pet. denied); City of Coppell v. Waltman, 997 S.W.2d 633, 636 (Tex. App.—Dallas
1998, pet. denied) (citing City of Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 678 (Tex.
1979)). The movant must expressly present to the trial court, by written answer or response, any
issues defeating the movant’s entitlement to summary judgment. See Fletcher, 26 S.W.3d at 74
(citing McConnell v. Southside Indep. Sch. Dist., 858 S.W.2d 337, 343 (Tex. 1993); City of
Houston, 589 S.W.2d at 679).
      We disregard all conflicts in the evidence and accept the evidence favoring the nonmovant as
true. See Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co., 391 S.W.2d 41, 47
(Tex. 1965); Fletcher, 26 S.W.3d at 73. We indulge every reasonable inference from the evidence
in favor of the nonmovant and resolve any doubts in its favor. See American Tobacco, 951
S.W.2d at 425; Fletcher, 26 S.W.3d at 73.
      When the trial court does not specify the grounds for its granting of a summary judgment, as
is the case here, we will affirm the judgment if any of the grounds within the motion are
meritorious. See Grimes v. Andrews, 997 S.W.2d 877, 881 (Tex. App.—Waco 1999, no pet.)
(citing State Farm Fire & Cas. Co. v. S.S., 858 S.W.2d 374, 380 (Tex. 1993)). We conduct a
de novo review in a summary judgment case. See Rucker v. Bank One, 36 S.W.3d 649, 653 (Tex.
App.—Waco 2000, pet. denied).
Applicable LawThe essential elements in a suit for breach of contract are: (1) existence of a valid contract;
(2) plaintiff performed or tendered performance; (3) defendant breached the contract; and (4)
plaintiff was damaged as a result of the breach. See Runge v. Raytheon E-Systems, Inc., 57
S.W.3d 562, 565 (Tex. App.—Waco 2001, no pet. h.). The element essential to the present case
is the existence of a valid employment contract entitling Wilkerson to “on-call” benefits. 
      In an employment-at-will situation, an employee policy handbook or manual does not, of
itself, constitute a binding contract for the stated benefits and policies unless the manual uses
language clearly indicating an intent to do so. See Guinn v. Bosque County, 58 S.W.3d 194, 200
(Tex. App.—Waco 2001, pet. filed) (citing Montgomery County Hosp. Dist. v. Brown, 965
S.W.2d 501, 502 (Tex. 1998)); Werden v. Nueces County Hosp. Dist, 28 S.W.3d 649, 651 (Tex.
App.—Corpus Christi 2000, no pet.); Gamble v. Gregg County, 932 S.W.2d 253, 255 (Tex.
App.—Texarkana 1996, no pet.). Nor does an employment policy handbook or manual create
property interests in the stated benefits and policies unless some specific agreement, statute or rule
creates such an interest. See Werden, 28 S.W.3d at 651; Gamble, 932 S.W.2d at 255.
Analysis
      Wilkerson contends that the City’s policy manual creates an entitlement to additional benefits
for “on-call” employees. Although his claim was brought under a breach of contract theory, he
argues that the only issue is whether he qualified as an “on-call” employee (a fact issue for the
trial court). 
      Here, the City has the burden to conclusively negate at least one essential element of the
Wilkerson’s breach of contract claim. See American Tobacco Co., 951 S.W.2d at 425. The City
argued that the policy manual did not create an employment contract right to “on-call” benefits. 
We agree.
      The City has shown evidence that Wilkerson cannot maintain a breach of contract action as
a matter of law because the policy manual alone did not create a valid employment contract. As
summary judgment evidence, the City presented the pertinent section of the policy manual
regarding “on-call” employees. The section of the Department’s policy manual regarding “on-call” pay provides as follows:
On-Call Pay - Employees who are required to be available for emergency situations on
an “on-call” basis will be compensated for stand-by duty at a rate of $10 per day plus
time and on-half for actual hours worked when called out. Those employees called out
for emergency situations who are not on an “on-call” status, will be compensated a
minimum of one hour of overtime pay.

The above provision does not express an intent to vest contractual or property rights. See Werden,
28 S.W.3d at 651 (citations omitted); Gamble, 932 S.W.2d at 255 (“the manual involved here
does not contain express contractual language”). Rather, it merely refers to “on-call” policies,
procedures, and guidelines. Id. Once the City facially established the right to a summary
judgment based on the failure of the policy manual to create a contract, Wilkerson has the burden
of introducing evidence that raises issues of fact. See City of Houston, 589 S.W.2d at 678;
Harrison, 983 S.W.2d at 35.
      In response to the City’s motion for summary judgment, Wilkerson cited the same policy
manual section and emphasized that “on-call” employees are, in fact, entitled to the “on-call” pay. 
He argues that the only issue is whether he was an “on-call” employee. Wilkerson, however,
failed to show any evidence that the language of the policy manual clearly indicated an intent to
form an employment contract between the City and him. Further, Wilkerson has not presented
any other evidence indicating an oral or written employment contract entitling him to “on-call”
benefits. He has also not shown a specific agreement, statute, or rule creating an interest in the
“on-call” benefits. We find Wilkerson has not expressly presented to the trial court, by written
answer or response, any issues defeating the City’s entitlement to summary judgment. See 
McConnell, 858 S.W.2d at 343; Fletcher, 26 S.W.3d at 74.
      Indulging every reasonable inference from the evidence before this Court in favor of
Wilkerson and resolving any doubts in his favor, we find no fact issue as to the existence of an
employment contract in the policy manual. See American Tobacco, 951 S.W.2d at 425; Fletcher,
26 S.W.3d at 73. Thus, he cannot maintain an action for breach of contract as a matter of law. 
Accordingly, we overrule Wilkerson’s first point.
      In view of our disposition of Wilkerson’s first point, we need not address the remaining
points. We affirm the judgment.
 
                                                                               REX D. DAVIS
                                                                               Chief Justice

Before Chief Justice Davis,
      Justice Vance, and
      Justice Gray
Affirmed
Opinion delivered and filed March 13, 2002
Do not publish
[CV06]



on testified that he had met with Nicholas
Sanchez on a couple of occasions and that he told him that, based on their interviews and the
results of his polygraph test, he would re-evaluate his case at some point. Jackson also discussed
with Nicholas Sanchez's attorney, Robert C. Dunn, the possibility of dismissing the charges, as
well as the possibility of deporting Nicholas Sanchez back to Mexico. However, Jackson stated
that at no time did he ever promise or agree to do anything more than re-evaluate the case
sometime in the future.
          Sanchez argues that the State and Nicholas Sanchez had entered into a "secret" agreement
to drop the charges against him in exchange for testifying against the defendant. Nicholas Sanchez
later testified against his uncle. Approximately five days after Sanchez's conviction, the charges
against Nicholas Sanchez were dropped. He was charged and pled no contest to the offense of
hindering apprehension and sentenced to one year in jail. Nicholas Sanchez testified that he had
not made any deals with the State in exchange for his testimony. However, he also testified that
he believed he was going home to Mexico after he testified. Sanchez claims that because he
believed he was going home there must have been a deal to dismiss the charges and have him
deported.


 
          At trial, Sanchez called Dunn to testify concerning any possible agreements between his
client and the State. He testified that the State had not made any agreements or promises other
than to look at the case again in the future. He also stated that he believed that the State would
not be able to convict Nicholas Sanchez and that he had "great aspirations" that the charges would
be dismissed. He further testified that there was information unknown to the jury that would bear
upon the way his client would be dealt with.  
          The purpose of informing the trial court and jury of any agreements, formal and informal,
is to ensure that the trier of fact will take into account the implications of such an agreement when
weighing the veracity of the testimony. See Virts v. State, 739 S.W.2d 25, 27 (Tex. Crim. App.
1987). In the present case, Sanchez has failed to produce any proof that the prosecution has
suppressed evidence of an agreement. While it is true that the prosecutor promised to re-evaluate
the case at a future time, he made no promise either express or implied that Nicholas Sanchez
would benefit if he testified against his uncle. He further testified that he specifically did not make
an agreement with Sanchez because he feared that it would compromise Nicholas Sanchez's
testimony. The record shows, that even if the promise to re-evaluate the case in the future could
be considered an agreement, the jury was informed of the testimony at trial. The trier of fact was
free to weigh the credibility of the testimony of Nicholas Sanchez in light of his statements about
deportation and the fact that he knew his case would be looked at again in the future. Therefore,
we overrule Sanchez's third point. 
          In his fourth point of error, Sanchez claims that the evidence was insufficient to convict
him of the offense of murder. Specifically, he argues that the State failed to offer sufficient
corroboration of the accomplice witness's testimony to convict him under article 38.14 of the Code
of Criminal Procedure. Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon 1979). We will
overrule this point.
          Article 38.14 states:
A conviction cannot be had upon the testimony of an accomplice unless
corroborated by other evidence tending to connect the defendant with the offense
committed; and the corroboration is not sufficient if it merely shows the
commission of the offense.

Id.
          The test to determine the sufficiency of the corroboration is "to eliminate from
consideration the evidence of the accomplice witness and then to examine the evidence of the other
witnesses with the view to ascertain if there be inculpatory evidence, that is evidence of
incriminating character which tends to connect the defendant with the commission of the offense." 
Gosch v. State, 829 S.W.2d 775, 777 (Tex. Crim. App. 1991), cert. denied, — U.S. —, 113 S.Ct.
3035 (1993) (quoting Edwards v. State, 427 S.W.2d 629 (Tex. Crim. App. 1968)). All direct and
indirect evidence may be looked to for corroboration. Brown v. State, 672 S.W.2d 487, 488 (Tex.
Crim. App. 1984). Furthermore, it is not necessary that the corroborative evidence directly link
the defendant to the crime or be sufficient in itself to establish guilt. Id. Even apparently
insignificant incriminating evidence may sometimes be considered satisfactory corroboration. 
Munoz v. State, 853 S.W.2d 558, 559 (Tex. Crim. App. 1993). The cumulative weight of the
other corroborating evidence must merely tend to connect the defendant with the offense. Id. 
                                        Accomplice Testimony
          The accomplice witness, Nicholas Sanchez, testified that he participated with Sanchez in
the murder of Gabriel Arredondo at the Navarro Pecan Company. He stated that on the night of
the murder Sanchez asked him to take him to the pecan factory. When they arrived, the defendant
told Nicholas Sanchez to "go by the vehicle where it's closest." As they drove by the vehicle,
Nicholas Sanchez said that he heard five shots and saw the window of the victim's vehicle shatter. 
He then stated that Sanchez had fired the shots. He further testified that the defendant told him
to drive straight home and that they should both go to their respective rooms.
                                        Non-accomplice Testimony
          The State presented evidence of a dispute between Sanchez and the victim that provided
him with a motive for the murder of Arredondo. Arredondo's wife, Bernadina, testified that
Sanchez was upset because his fourteen year old daughter had run off with her husband's half-brother, who was around 23 or 24 years of age. She stated that she felt that Sanchez held her
husband responsible for his daughter's disappearance. Furthermore, she testified that Sanchez had
come to her home in June 1993 to discuss the situation with her husband. She stated that Sanchez
threatened her husband and that he had grabbed her husband "by the arm and took him on the
street." 
          Sanchez, himself, testified that he had gone to the victim's house on two occasions to
discuss the situation concerning his daughter. He also testified that he had gone to the police to
enlist their aid in finding his daughter. When asked why he had gone to the victim's house, he
replied that some children were saying that the defendant's daughter had been taken in by
Arredondo. 
          Officer Lewis Palos also testified that Sanchez was upset because his daughter had run
away with another person and that he had expressed anger toward the victim. Palos testified that
"he spoke rather harshly at times that he didn't feel like we were doing enough to find her, to get
Mr. Arredondo to tell us where she was at." He also confirmed that the difficulty between
Arredondo and Sanchez was well known throughout the Hispanic community. Furthermore,
Officer Palos testified that when he told Sanchez that Arredondo had been killed the defendant
stated that it was good that he died and cursed him in Spanish. 
          The State also produced other corroborating evidence linking Sanchez to the murder. The
defendant had purchased a Smith and Wesson 9 millimeter pistol and a box of 9 millimeter
Norinco military ammunition from a gun shop approximately one week before the victim was shot. 
Both Sanchez and the gun shop owner testified as to the transaction.
          Raymond Cooper, a firearms and tool mark examiner at the Southwest Institute of Forensic
Science in Dallas, also testified for the prosecution. Arredondo died of three gunshot wounds to
the torso, and one bullet was recovered from the body. Cooper testified that the bullet was a 9
millimeter bullet consistent with the Norinco manufactured ammunition. He further testified that
the bullet casings submitted to him by the Corsicana Police Department were also of Norinco
manufacture. He testified that the bullet he examined from the body bore tool marks consistent
with being fired from only three possible guns, a Smith and Wesson pistol, a Smith and Wesson
revolver, or a Ruger revolver. He stated that the Ruger revolver could most likely be eliminated
from firing these particular bullets because the ammunition was fired from a semi-automatic
weapon. Furthermore, he stated that 9 millimeter revolvers that shoot 9 millimeter auto-pistol
ammunition are rare, and that in his opinion, the bullets were fired from a pistol. This evidence
tends to show that the gun used to kill Arredondo was most likely of the same make and model
as the firearm purchased by Sanchez. Moreover, the evidence shows that Sanchez had purchased
ammunition a week before the murder that was of the same caliber and manufacture as the bullets
that killed Arredondo.
          The State also produced other corroborating evidence linking Sanchez to the offense. 
Officer Mark Nanny of the Corsicana Police Department testified that he collected four 9
millimeter bullet casings at the crime scene and that he had observed broken glass around the
victim's vehicle that appeared to have come from the broken driver's window. A witness at the
pecan factory tentatively identified the vehicle used in the shooting and directed Officer Nanny to
Sanchez's house on South 15th street. When Nanny arrived at Sanchez's home, he testified that
he looked at Nicholas Sanchez's vehicle parked in the driveway. He stated that he observed
broken glass on the cushion of the right front seat and that all window glass on the car was intact. 
He also testified that he observed a fifth 9 millimeter casing on the right rear floorboard of the
vehicle that was later identified as also being of Norinco manufacture.
          When viewing all of the corroborating facts and circumstances as a whole, it is clear that
the evidence tends to connect Sanchez to the commission of the offense. There is evidence of an
ongoing dispute with the victim. In addition, he had purchased bullets identical to the one used
to kill Arredondo, and he had bought a gun of the same make and model as the probable murder
weapon. In addition, the glass and the bullet casing were found in his accomplice's vehicle parked
outside his house, while both parties were present at the house. And finally, Sanchez reacted to
the news Arredondo was dead by cursing him and saying that it was good that he was dead. We
find that the evidence was sufficient to corroborate the testimony of the accomplice witness and
overrule Sanchez's last point of error. 
          The judgment is affirmed.
                                                                                 BOBBY L. CUMMINGS
                                                                                 Justice

Before Justice Cummings and
          Justice Vance
Affirmed
Opinion delivered and filed March 13, 1996 
Do not publish